**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

RAM CHATURVEDI,

          Appellant,

      v.

DEPARTMENT OF VETERANS
    AFFAIRS,

          Agency.

DOCKET NUMBER
DA-1221-11-0471-W-4

DATE: April 15, 2015

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Stephen M. Kohn, Esquire, Washington, D.C., for the appellant.

Kenneth S. Carroll, Dallas, Texas, for the agency.

## BEFORE

Susan Tsui Grundmann, Chairman
Mark A. Robbins, Member

## FINAL ORDER

¶1       The appellant has filed a petition for review and the agency has filed a cross petition for review of the initial decision, which denied corrective action in the appellant's individual right of action (IRA) appeal. Generally, we grant petitions such as these only when: the initial decision contains erroneous findings of

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. *See* Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, and based on the following points and authorities, we conclude that neither party has established any basis under section 1201.115 for granting the petition or cross petition for review. Therefore, we DENY the petition for review and the cross petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

¶2        On September 30, 2007, the agency appointed the appellant to a Physician position under a temporary appointment not to exceed September 29, 2010, in the Interventional Radiology Department (IR) at the North Texas Health Care System. W-1 File,[2] Tab 5, Subtab 4b. Effective January 20, 2010, the agency terminated his appointment before its scheduled expiration date based on seven allegations of misconduct. W-1 File, Tab 5, Subtabs 4, 4c-4d.

¶3        After exhausting his administrative remedies with the Office of Special Counsel, the appellant filed this appeal. The administrative judge convened a hearing and issued an initial decision that found that the appellant established jurisdiction over the appeal and proved that he made protected disclosures that were a contributing factor in a personnel action. Initial Decision (ID) at 14-21. She determined, however, that the agency established by clear and convincing

---

[2] This appeal was dismissed without prejudice three times. The file for MSPB Docket No. DA-1221-11-0471-W-1 will be referred to as the W-1 File. The labels "W-2 File" and "W-3 File" refer to the files in MSPB Docket Nos. DA-1221-11-0471-W-2 and DA-1221-11-0471-W-3, respectively. The term "Initial Decision" refers to the initial decision issued on March 28, 2014, under MSPB Docket No. DA-1221-11-0471-W-4.

evidence that it would have taken the same personnel actions absent any protected whistleblowing. ID at 21-34. The appellant petitions for review of the initial decision[3] and the agency cross petitions for review. PFR File, Tabs 4, 8. We address the appellant's petition for review first.

¶4 The administrative judge determined that four personnel actions were at issue in this appeal: the termination of the appellant's appointment on January 20, 2010; his negative performance evaluation in October 2009; and "the agency's disciplinary actions," which appear to refer to a written counseling in August 2009, and a proposed letter of reprimand, never effected, in September 2009. ID at 13-14; *see* W-1 File, Tab 1, Subtabs 3-4, 8, 11. The agency presented evidence that other employees at the appellant's duty station raised a steady stream of complaints about his attitude towards them, particularly towards nurses[4] and other "subordinates," and about his interactions with patients. W-1 File, Tab 14, Subtab 15; HT at 151-52. Dr. M.G., Service Chief of Radiology and the appellant's first-level supervisor, testified that he spoke with the appellant about this and issued the written counseling in August 2009, when the appellant's behavior did not improve. HT at 153, 189-92; W-2 File, Tab 9, Subtabs 11, 24. Dr. M.G. also testified that he proposed to reprimand the appellant in September 2009, when the appellant took leave without obtaining approval from a supervisor. HT at 68-72; W-2 File, Tab 9, Subtab 14. Dr. M.G. never issued the proposed reprimand.

¶5 Dr. M.G. testified that he gave the appellant a negative rating in October 2009, based on the appellant's performance under the performance

---

[3] The appellant also submits extensive excerpts from the hearing transcript. Petition for Review (PFR) File, Tab 3. We have not considered this submission because the record includes a complete copy of the transcript. Evidence that is already a part of the record is not new. *Meier v. Department of the Interior*, 3 M.S.P.R. 247, 256 (1980).

[4] Dr. M.G., Service Chief of Radiology, testified that the appellant "had berated [nurses] publically in front of patients" for the issues he raised in his protected disclosures. Hearing Transcript (HT) at 39-40.

standard relating to "Personality, Team Player, and Ethical Standards" because of the appellant's inability to get along with his coworkers or to improve his interpersonal relationships despite repeated attempts to address concerns about the appellant's behavior towards others in the hospital. HT at 212; W-3 File, Tab 14 at 35-36. He explained that he had rated the appellant more positively in this critical element in past years because he tended to be lenient, but his supervisors had instructed him to reduce the leniency of his grading to afford greater weight to the more important critical elements and to "increase the spread" of ratings among employees. HT at 92-93.

¶6        Dr. M.G. testified that he requested to terminate the appellant early because: his negative interactions with staff continued; Dr. M.G. had received complaints from several other physicians who no longer wished to refer their patients to the appellant; one employee requested a transfer out of the department because of the appellant's behavior and another threatened to involve his union in the conflict between the appellant and staff; nurses complained about the appellant's apparent indifference to or disregard for pain suffered by patients during his procedures; several patients did not want the appellant to perform their procedures; and the appellant received very poor evaluations from resident doctors.[5] HT at 94-110, 154, 215-34, 236-54; W-1 File, Tab 5, Subtabs 4e-4n; W-2 File, Tab 9, Subtabs 35-40; W-3 File, Tab 14 at 100, 114-20.

¶7        When an appellant shows by preponderant evidence that he made a protected disclosure which was a contributing factor in the decision to take a personnel action, the Board will order corrective action unless the agency shows by clear and convincing evidence it would have taken the same action absent any whistleblowing. *Aquino v. Department of Homeland Security*, 121 M.S.P.R. 35, ¶ 25 (2014). Clear and convincing evidence "is that measure or degree of proof

---

[5] In fact, after receiving a poor evaluation from an anonymous resident, the appellant inquired as to what type of punitive action would be appropriate to prevent disgruntled residents from retaliating against physicians. W-3 File, Tab 14 at 120; HT at 202-03.

that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(d). It is a higher standard than preponderant evidence. *Id.*

¶8        In determining whether an agency has met its burden, the Board will consider all of the relevant factors, including the following, which are known as the *Carr* factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999); *Parikh v. Department of Veterans Affairs*, 116 M.S.P.R. 197, ¶ 36 (2011). The Board must consider all the pertinent record evidence in making this determination, both evidence that supports the agency's case and evidence that detracts from it. *See Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012); *see also Rumsey v. Department of Justice*, 120 M.S.P.R. 259, ¶ 30 (2013).

¶9        The agency presented extensive documentary evidence and hearing testimony and, after considering both the agency's and the appellant's evidence, the administrative judge determined that the agency met its clear and convincing evidence burden. ID at 21-34. The administrative judge based her finding on several factors. First, the agency's evidence in support of its actions was strong and was bolstered by the credibility of the agency's witnesses *and* by the appellant's demeanor while testifying. ID at 31-32. Second, aside from the evidence that satisfied the knowledge/timing test, there was no evidence of any retaliatory motive. She found that the agency welcomed the appellant's complaints because it did not want to have bad nurses; it only needed more specific facts so it could investigate the allegations and correct any problems it discovered. ID at 32-33. She also found that the manager who allegedly retaliated against the appellant gave him a positive performance rating and a

bonus after he began making his disclosures. ID at 33. Third, she found that there was no evidence considering any similarly-situated employees. *Id.*

¶10    On review, the appellant contends that the administrative judge overlooked impeachment evidence that undercut her finding that the agency had strong evidence in support of its action. PFR File, Tab 4 at 22-23. The appellant correctly points out that only one nurse, Nurse S.L., testified that he behaved inappropriately towards IR nurses, and he argues that her testimony was based on gossip and snooping and she was worried that she was going to get fired as a result of his disclosures and thus had reason to be biased against him. PFR File, Tab 4 at 22-23; HT at 340. The appellant asserts that all of the other witnesses presented testimony that "completely impeached the [agency's] allegation that [the appellant's] conduct towards the nurses was improper." PFR File, Tab 4 at 23.

¶11    The administrative judge did not overlook the testimony to which the appellant refers. She discussed it in the initial decision and implicitly found that it did not undercut the agency's evidence of the appellant's improper behavior towards the nurses in his own department. ID at 25-28. Doctor M.M., Doctor V.V., and Technician J.T. testified that they had a high opinion of the appellant's clinical skills and professionalism, but they all worked in different departments and had not observed how the appellant behaved towards the IR nurses. HT at 320-28, 365-72, 376-87. Doctor N.E., one of the appellant's former supervisors, also had a high opinion of him and worked in the IR, but she generally only knew about the end results of his procedures and not the means of accomplishing the procedures or the details of what occurred during the procedures. HT at 112-22. The fact that these witnesses did not observe if the appellant engaged in objectionable behavior is entitled to little probative value given that they had little opportunity and capacity to observe the events in question. *See McGowan v. Veterans Administration,* 30 M.S.P.R. 221, 223 (1986) (testimony of certain witnesses was not probative because they were not present

to witness the entire incident in question); *see also Social Security Administration v. Long*, 113 M.S.P.R. 190, ¶¶ 33-34 (2010) (the opportunity to observe the event in question is a factor in determining credibility) (citing *Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987)), *aff'd*, 635 F.3d 526 (Fed. Cir. 2011). Moreover, the appellant's own testimony does not outweigh the testimony of Nurse S.L. because the administrative judge found that his testimony was not credible. *See McGowan*, 30 M.S.P.R. at 223. The Board must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing; the Board may overturn such determinations only when it has "sufficiently sound" reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). Here, the administrative judge explicitly relied on witness demeanor as one of the factors in making her credibility determinations. ID at 31-32. Thus, because the appellant has not proffered a sufficiently sound reason for disturbing the administrative judge's credibility determinations, we must defer to them.

¶12    Dr. M.G. testified that, although he had been fielding ongoing complaints about the appellant's behavior for some time, "[T]he thing that broke the camel's back was the disregard for patients'—for severe patient pain." HT at 258-59. This statement refers to two incidents in December 2009.[6] One involved a patient who suffered an allergic reaction to a dye the appellant injected during a procedure. It appears that the appellant continued the procedure rather than managing the patient's reaction before continuing the procedure. HT at 215-34; W-1 File, Tab 5, Subtabs 4e, 4h. In the second incident, when another patient, Patient T., screamed in apparent pain during a procedure, the appellant continued

---

[6]  Dr. M.G. testified about several other similar incidents during the same time period, HT at 240-58, but these two incidents appear to be the most important in Dr. M.G.'s decision to terminate the appellant's appointment.

the procedure without attending to the patient's pain.  HT at 239-44; W-1, Tab 5, Subtabs 4f, 4h-4j.

¶13      On review, the appellant asserts that the evidence in support of the agency's version of the two events that triggered his termination was weak, and was entirely rebutted by his own testimony that his conduct of the procedures was appropriate, ethical, and consistent with the highest standards of care.  PFR File, Tab 4 at 26.  The appellant contended below that the patient was in no danger and that he stopped the procedure and administered an antihistamine when the patient reported "a little itch or whatever."  HT at 598-600.  We find these arguments unpersuasive.  In fact, the record reflects that the patient's throat had begun to close.  HT at 219; W-1 File, Tab 5, Subtabs 4e at 1, 4h at 2.

¶14      The appellant justified the second incident by stating that the patient was in no danger, the procedure would not cause severe pain, and Patient T.'s screaming was not necessarily related to any actual pain.  HT at 587-92.  Patient T. was an elderly patient with dementia and he was known to scream with little provocation, but his reputation for screaming does not mean he was incapable of feeling pain and this was a painful procedure.  HT at 240-41, 721.  Patient T.'s protests during the procedure were loud enough to upset patients waiting for their procedures in the holding room.  HT at 241; W-1 File, Tab 5, Subtabs 4j-4k.  It is unclear how the appellant could be so certain Patient T. was not experiencing any pain,[7] and he does not appear to have considered the disruptive or downright frightening effect on waiting patients.  Dr. M.G. testified, "It's inhumane to do a procedure

---

[7] The appellant claimed for the first time during cross-examination that he administered local anesthetic at the beginning of the procedure but merely failed to document it in the medical record.  HT at 719-27.  However, in an affidavit submitted with his appeal and in his testimony on direct examination, he stated that he had local anesthetic administered at the end of the procedure when the patient's incision was sewn shut; he further stated that he made an intentional decision not to administer sedation or anesthetic at the beginning of the procedure because he believed that the risks outweighed the benefits.  *Compare* HT at 490-92, *with* HT at 720; *see* HT at 737-38; *see also* W-1 File, Tab 1, Subtab D at 3-4.

on an elderly demented person and—who is yelling loud enough to prevent somebody else in the next-door room from having their procedure, and still withhold the pain medication and the sedation." HT at 244.

¶15    In any event, the administrative judge found that the appellant's version of events was not credible explicitly based, in part, on his demeanor. ID at 31-32. Her findings are entitled to deference absent a "sufficiently sound" reason for overturning them. *See Haebe*, 288 F.3d at 1301. The appellant has proffered no such reason.

¶16    The appellant also alleges on review that the agency's case against him is weak because it relied primarily on hearsay evidence. PFR File, Tab 4 at 27-32. It is well-settled law that relevant hearsay evidence is admissible in administrative proceedings. *Luten v. Office of Personnel Management*, 110 M.S.P.R. 667, ¶ 12 (2009). The probative value of hearsay evidence may, in appropriate circumstances, be outweighed by other evidence of record, including an appellant's hearing testimony. *See Luten*, 110 M.S.P.R. 667, ¶ 12; *see also Borninkhof v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981) (assessment of the probative value of hearsay evidence necessarily depends on the circumstances of each case). Hearsay must be evaluated on a case-by-case basis to determine if it is inherently truthful and more credible than the evidence offered against it. *Vojas v. Office of Personnel Management*, 115 M.S.P.R. 502, ¶ 13 (2011); *Long*, 113 M.S.P.R. 190, ¶ 27.

¶17    While the appellant is correct that the fact that much of the agency's case against him is based on hearsay evidence, which is generally entitled to less weight than live testimony, we find that the administrative judge properly afforded the hearsay evidence significant weight under the circumstances of this case. The appellant argues that the hearsay evidence is not reliable because the declarants were biased against him and because their statements were fully contradicted by his own testimony. PFR File, Tab 4 at 27-32. There was some evidence that the declarants were concerned that the appellant could retaliate

against them should he ever become a manager.[8] HT at 356-57. The concerns of the declarants that there might be a penalty exacted for their coming forward does not necessarily detract from their statements. Further, the fact that the appellant's testimony contradicted the hearsay evidence does not detract significantly from its reliability because the administrative judge found that the appellant's testimony was not credible and her credibility findings are owed deference. ID at 31-32. Therefore, although the agency's case relied fairly heavily on hearsay evidence, we find that the hearsay nature of the agency's evidence did not have a significant impact on the reliability of that evidence or on the strength of the agency's case against the appellant.

¶18    The administrative judge also found that there was little evidence that the deciding official harbored a retaliatory motive against the appellant. ID at 32-33. On review, the appellant challenges this finding and identifies several bits of evidence that could possibly be interpreted as reflecting an improper motive. PFR File, Tab 4 at 15-21.

¶19    The appellant disclosed on July 1, 2008, alleged poor performance on the part of the nurses, mostly by their alleged failure to be immediately available when needed, by carrying cell phones in the ward, and by eating in the ward. W-1 File, Tab 1, Subtab C. The appellant asserts that Dr. M.G. did not take his disclosures seriously and showed a disregard for patient safety, but actually Dr. M.G. asked the appellant for more specific information so he could have the allegations investigated through proper channels by the Nurse Manager's office. PFR File, Tab 4 at 15-17, 19-21; HT at 34, 63. The appellant also points to Dr. M.G.'s admission that he let some things slide and that the appellant's concerns had to be addressed in context as evidence that Dr. M.G. "held patient safety in contempt." PFR File, Tab 4 at 16-21; HT at 46-48, 155-57. Context

---

[8] The appellant had a tendency towards vindictiveness, as evidenced by his email, W-3 File, Tab 14 at 120, seeking advice on how to punish the residents who gave him a bad evaluation. *See supra* note 5.

matters. There is an enormous difference between a nurse in an understaffed ward who is unavailable to answer pages as quickly as a physician might like because she is attending another patient, and a nurse who is available to respond to a page and chooses not to do so. Dr. M.G. acknowledged that there were technical violations of hospital rules that potentially put the hospital's accreditation at risk, but explained that the agency had a nursing shortage and that nurses sometimes ate in the nonpatient care areas of the ward because otherwise they would have to skip lunch altogether. HT at 46-47, 155-57. Considered in this context, we find that Dr. M.G.'s decision to disregard some technical violations of the rules by tolerating the nurses' decision to give up their lunch breaks so they could still eat and be available to patients does not support a conclusion that he "held patient safety in contempt."

¶20    The appellant also identifies what he considers to be direct evidence of retaliatory motive. PFR File, Tab 4 at 15-18. He alleges that Dr. M.G. testified that he was "displeased" about the appellant's disclosures, HT at 42-43, and the hospital's Chief of Staff called the disclosures "inflammatory" and hostile towards the nurses,[9] HT 50-53, 55. He also alleges that Dr. M.G. wanted the appellant to raise concerns quietly and in a nice way. PFR File, Tab 4 at 18; HT at 59. Again, we find the appellant's arguments unpersuasive. Dr. M.G. repeatedly made it clear that he welcomed the appellant's disclosures because he did not want incompetent nurses treating veterans and it was in his best interest to ensure that this did not happen, HT at 155, but he was concerned that the hostile

---

[9] In his disclosure, the appellant referred to the nurses as "not concerned about their duties toward our patients" and having an "uncaring to callous attitude." W-2, Tab 9, Subtab 3 at 30. He further described some unnamed nurses as exhibiting "constant passive aggressive and troublemaking behavior" and referred to them as "deviants." *Id.* at 32. According to *Webster's Third New International Dictionary of the English Language Unabridged* 1159 (Philip Babcock Gove et al. eds., 1993), a common definition of the word "inflammatory" is "tending to excite anger, animosity, disorder, or tumult." The manner in which the appellant characterized the nurses' presumed intent and motives could most certainly be perceived as "inflammatory."

nature of the appellant's disclosures might further degrade the poor relationship between the appellant and the nurses. He explained that he considered some of the appellant's disclosures to be hostile because the appellant called some of his coworkers "deviants" and said they were "uncaring" or "callous," HT at 54, and he testified that saying that he wanted staff to raise issues in a nice way meant that he expected the employees to raise their issues not in public and not in front of patients, and to behave in a professional manner. HT at 59. He testified:

> [M]y concern with [the appellant] all along was not the specifics of the allegations he was making; it was the manner. The manner in which he publically berated and demeaned the nurses. Not the—not the allegations themselves, which I felt were worthy of being referred up the chain of command to be investigated, but the actual manner in which he engaged the nurses, as I counseled him many times.

HT at 48-49. In fact, despite the appellant's disclosures, Dr. M.G. credibly testified that he recommended the appellant's reappointment in September 2009, and the appellant was reappointed despite the counseling he had received about how he treated the nurses and the poor evaluations he received from the residents. HT at 205-06; W-2 File, Tab 9, Subtab 34. Therefore, we agree with the administrative judge that any slight evidence of retaliatory motive is outweighed by other evidence of record weighing against a finding of retaliatory motive. ID at 32-33. Considering the record evidence as a whole, the administrative judge correctly found scant evidence of retaliatory motive. *Cf. McCarthy v. International Boundary & Water Commission,* 116 M.S.P.R. 594, ¶ 32 (2011) (finding that in some cases, circumstantial evidence bearing on retaliatory motive includes the substance of the appellant's protected activity as well as the extent to which the relevant management officials were aware of it), *aff'd*, 497 F. App'x 4 (Fed. Cir. 2012), *cert denied*, 134 S. Ct. 386 (2013).

¶21      We further find that the administrative judge correctly found that there was no evidence regarding any action the agency may have taken against any similarly-situated employees who engaged in similar misconduct but were not

whistleblowers. ID at 33. On review, the appellant argues that the fact that the agency presented no evidence concerning its treatment of similarly-situated nonwhistleblowers creates an adverse inference against the agency. PFR File, Tab 4 at 21. The Federal Circuit has recognized that an agency has no affirmative burden to produce evidence on all of the three *Carr* factors; they are merely pertinent considerations for determining whether the agency's evidence meets the clear and convincing evidence test. *Whitmore*, 680 F.3d at 1374. If there is some reason to believe that the agency has evidence concerning similarly-situated nonwhistleblowers but has failed to produce it, it may be appropriate to weigh the failure to produce such evidence against the agency. *See id.* In this regard, *Whitmore* refers to *Chambers*, in which the Board determined that the agency's failure to show that it took similar actions against similarly-situated nonwhistleblowers, together with the finding that the agency's case against the appellant was not very strong and the agency had a strong motive to retaliate, prevented the Board from forming a firm conviction that the agency would have taken the same action absent the appellant's whistleblowing. *See Chambers v. Department of the Interior*, 116 M.S.P.R. 17, ¶ 70 (2011). In such a case, if the agency fails to produce some evidence concerning similarly-situated nonwhistleblowers, the agency fails to meet its burden of proof because there is nothing to counterbalance the adverse findings on the first two *Carr* factors.

¶22     The appellant does not cite any precedent standing for the proposition that an agency will fail to meet the clear and convincing evidence test solely because it introduced no evidence concerning similarly-situated employees. Rather, the Federal Circuit suggests that, except in unusual situations, if there is no evidence that the agency took similar actions against nonwhistleblowers, then that factor drops out of the analysis. *See Whitmore*, 680 F.3d at 1374. This is the approach the Board has taken for some time. *See McCarthy*, 116 M.S.P.R. 594, ¶ 65; *see also Sutton v. Department of Justice*, 94 M.S.P.R. 4, ¶ 19 (2003), *aff'd*, 97 F. App'x 322 (Fed. Cir. 2004). In this case, as in *McCarthy* and *Sutton*, there

was strong evidence in support of the agency's case against the appellant, weak evidence of motive, and no evidence concerning similarly-situated employees. Under the circumstances, we find that it is not appropriate to draw an adverse inference against the agency but, rather, that the third *Carr* factor is not a significant consideration under the circumstances of this case. *See Rumsey*, 120 M.S.P.R. 259, ¶ 36 ("There is no evidence in the record concerning how the agency [treated] appropriate non-whistleblower comparators, so consideration of this factor does not materially assist [the Board] in deciding whether the agency has met its burden of proof.").

¶23  To meet the clear and convincing standard, the evidence must produce a "firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e); *Rumsey*, 120 M.S.P.R. 259, ¶ 34. Weighing the strength of the agency's evidence in support of its decision to terminate the appellant's temporary appointment prior to its expiration date and to take other personnel actions as discussed above against the very weak evidence of retaliatory animus that may tend to indicate that Dr. M.G. had some motive to retaliate against appellant, we find that the agency would have taken the same actions even if the appellant had not engaged in any protected activity. Therefore, we find that the agency has met its burden of showing by clear and convincing evidence that it would have taken the same actions absent any whistleblowing, and we DENY the appellant's petition for review.

¶24  In its cross petition for review, the agency argues that the administrative judge erred by finding that the appellant proved that his disclosure was a contributing factor in a personnel action. PFR File, Tab 8 at 23-28. Given our finding above that the agency proved by clear and convincing evidence that it would have taken the same personnel actions absent any whistleblowing, resolution of the agency's cross petition for review in favor of the agency would not affect the outcome of this appeal. We find, therefore, it is not necessary to address the agency's cross petition for review and we DENY it.

**NOTICE TO THE APPELLANT REGARDING
YOUR FURTHER REVIEW RIGHTS**

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit.

The court must receive your request for review no later than 60 calendar days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of the Board's decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this final decision by the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days after the date of this order. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. You may choose to request review of the Board's decision in the United States Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both. Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode.htm. Additional information about the United States Court of Appeals for the Federal

Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

If you are interested in securing pro bono representation for an appeal to the United States Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD:                    _____
                                  William D. Spencer
                                  Clerk of the Board

Washington, D.C.