Wilkins, Circuit Judge, with whom Rogers, Circuit Judge, joins, concurring: I concur with the Court’s decision in full. This petition involves a challenge to a final decision in an adjudication by the Consumer Financial Protection Bureau (“CFPB”). Petitioners are quite clear that they seek review of the “Decision of the Director” and the “Final Order” issued by the CFPB’s Director that, together, constitute the Bureau’s final agency action in cm-adjudication. Petition 1-3. The petitioners (and our dissenting colleagues) seek to downplay this basic -fact, .even though it is the bedrock for the exercise of our jurisdiction. They do so because acknowledging that the Director has significant adjudicatory responsibilities—indeed, the Director’s adjudicatory -functions are the only powers at issue in this case—seriously undermines the separation-of-powerp challenge before us. All in all, those significant quasi-judicial duties, as well as the Director’s quasi-legislative duties and obligations to coordinate and consult with other expert agencies, provide additional grounds for denial of the separation-of-powers claim before us. I. Congress authorized the CFPB “to conduct hearings and adjudication proceeding's” to “ensure or enforce compliance with” the provisions of the Dodd-Frank Act establishing the authority of the CFPB and any rules issued thereunder, and “any other Federal law that the Bureau is authorized to enforce .... ” 12 U.S.C. § 5563(a)(l)-(2). The Bureau must do so in the “manner prescribed” under the Administrative Procedure Act (“APA”), 5 U.S.C. §§ 551 et ,seq. 12 U.S.C. § 5563(a). The CFPB can bring enforcement actions in either a court or an administrative .proceeding. “The court (or the Bureau, as the case may be) in an action or adjudication proceeding brought under Federal consumer financial law, shall have jurisdiction to grant any appropriate legal or equitable relief ....’’Id. § 5565. In 2012, the CFPB issued a final rule pursuant to 12 U.S.C. § 5563(e) to establish rules of practice for adjudication proceedings. 12 C.F.R. § 1081. The Director does- not initiate investigations. Rather, “[t]he Assistant Director of the Office of Enforcement and the Deputy Assistant Directors of the Office of Enforcement have, the nondelegable .authority to initiate investigations,” id. § 1080.4, just as they have the authority to- close CFPB investigations, id. § 1080.11(c). If the investigation merits enforcement within the agency, Bureau lawyers commence the proceeding with the filing of a Notice of Charges, id. § 1081.200, as was done here, J.A. 41, and the matter proceeds to a hearing. The “hearing officer,” defined as “an administrative law judge or any other person duly authorized to preside at .-a hearing,” id. § 1081,103, is vested with wide adjudicatory authority, including the power to issue subpoenas, order depositions, hold settlement conferences, and “rule upon, as'justice may require, all procedural and other motions appropriate in adjudication proceedings.” Id. § 1081.104(b)(2), (3), (7), (10). Most importantly, at the close of the administrative proceedings,' “[t]he recommended decision shall be made and filed by the hearing officer who presided over the hearings ...Id: § 1081.400(d). The Director of the Bureau acts as the chief adjudicatory official. Whether or hot the parties choose to appeal the recommended decision, it goes to the CFPB Director, who “shall ... either issue a final decision and order adopting the recommended decision, or order further briefing regarding any portion of the recommended decision.” Id. § 1081.402(b). If the Director determines that it would - “significantly aid[ ]” the decisional process, the Director may order oral argument. Id. § 1081.404(a). ■ As the Director- considers the recommended decision, the Director “will, to the extent necessary or desirable, exercise all powers which he or she could have exercised if he or she had made the recommended decision.” Id. § 1081.405(a). The Director’s final decision must be served on the parties tod published in an order. Id, § 1081.405(e). The Director rendered a final decision and order as the chief adjudicatory official of the Bureau in this case. J.A, 1-40. That adjudication is the basis of the petition for review, Petition 1-3, and that adjudication provides the basis for our subject matter jurisdiction. Pet’r’s Br. 4. II. The adjudicatory nature of the order under review is material to the questions raised by the instant petition. We have an extensive line of authority, from the time of the Framers to the present, establishing that removal restrictions of officers performing adjudicatory functions intrude far less on.the separation of powers than removal restrictions of officers who perform purely executive functions. From the time of the Constitution’s enactment, the Framers recognized that adjudication poses a special circumstance. Even James Madison, one of strongest and most articulate proponents “for construing [Article II] to give the President the sole power of removal in his responsibility for the conduct of the executive branch,” Myers v. United States, 272 U.S. 52, 117, 47 S.Ct. 21, 71 L.Ed. 160 (1926) (citation omitted), acknowledged the “strong reasons why” an executive officer who adjudicates disputes “between the United States and particular citizens ... should not hold his office at the pleasure of the Executive branch of the Government.” 1 Annals of Cong. 611-12 (1789) (Joseph Gales ed., 1834) (statement of James Madison). Consistent with Madison’s view, the Supreme Court has held that the evaluation of removal restrictions for an officer “will depend upon the character of the office.” Humphrey’s Executor v. United States, 295 U.S. 602, 631, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). As a result, the scrutiny of a removal restriction for an officer “with -no duty at all related to either.'the legislative or judicial power,” differs from that of an officer who “perform[s] other specified duties as a legislative or as a judicial aid,” as the latter “must be free from executive control,” id. at 627-28,-55 S.Ct. 869. The Court continued: We think it plain under the Constitution that illimitable power 'of removal is not possessed by the President in respect of officers of the character of those just named. The authority of'Congress, in creating quasi legislative or quasi judicial agencies, to require them to act in discharge of their duties independently of executive control cannot' well be doubted; and that authority includes, as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal except for cause in the meantime. For it is quite evident that one who holds his office only during the pleasure of another cannot be depended upon to máintain an attitude of independence against the latter’s will. Id. at 629.. Relying upon the “philosophy of Humphrey’s Executor,” the Court later held that the power to remove “a member of an adjudicatory body” at will and without cause is not “given to the President directly by the Constitution.” Wiener v. United States, 357 U.S. 349, 356, 78 S.Ct. 1275, 2 L.Ed.2d 1377 (1958). To be sure, the adjudicatory nature of an officer’s duties is not "dispositive. The analysis is much more nuanced. The modern view is “that the determination of whether the Constitution allows Congress to impose a ‘good cause’-type restriction on the President’s power to remove an official cannot be made to turn on whether or not that official is classified as ‘purely executive.’ ” Morrison v. Olson, 487 U.S. 654, 689, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988). Thus, rather than “defining] rigid categories of those officials who may or may not be removed at will -by the President,” courts focus squarely on the separation-of-powers principle at stake: “en-sur[ing] that Congress does not interfere with the President’s exercise of the ‘executive power’ and his constitutionally appointed duty to ‘take care that the laws be faithfully executed’ under Article II.” Id. at 689-90, 108 S.Ct. 2597 (footnote omitted). Despite its rejection in Morrison of the simple categorization of officers, the Sur preme Court was clear that it “d[id] not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant.” Id. at 691, 108 S.Ct. 2597. As Madison recognized, the faithful execution of the laws may require that an officer has ■ some independence from the President. To provide for due process and to avoid the appearance of impropriety, agency adjudications are structured to be “insulated from political influence” and to “contain many of the same safeguards as are available in the judicial process.” Butz v. Economou, 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (holding, among other things, that safeguards from political influence entitled the Secretary of Agriculture’s designee, who rendered final decisions in agency adjudications, to absolute immunity). The Article II inquiry is informed by the consistent recognition of the imperative to safeguard the adjudicatory officer from undue political pressure. Thus, even if not dispositive, the quasi-judicial functions of the CFPB Director are still relevant to our inquiry, and those functions seriously undermine petitioners’ separation-of-powers objection. See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 507 n.10, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (noting that its holding, which struck down two layers of good-cause removal restrictions for members of the Public Company Accounting Oversight Board, did not necessarily apply to administrative law, judges who, “unlike members of the Board, ... perform adjudicative rather than enforcement or policymaking functions”).[1] In sum, the Supreme Court has consistently rendered its “judgment that it was not essential to the President’s proper execution of his Article II powers that [quasi-judicial and quasi-legislative] agencies be headed up by individuals who were removable at will.” Morrison, 487 U.S at 691,108 S.Ct. 2597. Indeed, in his dissent in Morrison, Justice Scalia even acknowledged that “removal restrictions have been generally regarded as lawful” for independent agencies “which engage substantially in what has been called the ‘quasi-legislative activity’ of rulemaking” and “the ‘qqasi-judicial’ function of adjudication.” Id. at 724-25,108 S.Ct. 2597 (citations omitted, emphasis added). Here, is there any doubt that the CFPB Director substantially engages in both of these activities? Of course not. In addition to the final adjudication authority described above, Congress granted the Director rulemaking authority for the Bureau. 12 U.S.C. § 5512(b). Thus, the Director (and the Bureau) fit squarely within the zone “generally regarded as lawful” by every Justice in Morrison and in the unbroken line of authority from the Supreme Court described above and in our Majority Opinion. III. Disagreeing with the weight of authority, the dissenters take two major tacks, neither of which is sufficient to overcome the Court’s precedent. First, the dissenters attempt to recast this case as more about the Director’s pure executive power of enforcement rather than about the quasi-judicial power of adjudication. Henderson Dissenting Op. 33; Kavanaugh Dissenting Op. 15-17, 20-23 & n.2. But what we have before us is the Director’s order of adjudication. Pet’ris Br. 4 (Jurisdictional Statement). This essential detail, along with the fact that the Director has substantial adjudicative responsibilities, is minimized. This recasting is significant, because Judge Henderson contends that the Court’s precedents should be read to deem removal protections for a principal officer in violation of the separation of powers unless the officer’s “primary function is adjudication,” Henderson Dissenting Op. 33 (emphasis in original), and Judge Kava-naugh emphasizes over and again that this case is “about executive power,” Kava-naugh Dissenting Op. 1, because the CFPB Director has “substantial executive authority.” Id. at 3,125 S.Ct. 377; see also id. at 5, 7, 8, 18, 68, 73, 125 S.Ct. 377 (characterizing the Director’s “substantial executive power” or “authority”). This line of attack collapses under its own weight. The vast majority of independent agencies have significant enforcement and adjudicative responsibilities, and these shared duties are expressly addressed by the APA. 5 U.S.C. § 554(d). If the dissenters were correct, then it would violate the separation of powers for any such independent agency to be headed by a principal officer with tenure protection. This has never been the law. At the time of Humphrey’s Executor, the Court was well aware that the Federal Trade Commission (“FTC”) exercised both enforcement, 15 U.S.C. §§ 45(b), 46, and adjudicative functions, Fed. Trade Comm’n v. Winsted Hosiery Co., 258 U.S. 483, 490, 42 S.Ct. 384, 66 L.Ed. 729 (1922), but it nonetheless upheld the removal protections of FTC Commissioners. 295 U.S. at 629, 55 S.Ct. 869. Similarly, in Free Enterprise Fund, the Court was not troubled that Securities and Exchange Commission (“SEC”) Commissioners enjoyed strong removal protection, 561 U.S. at 487, 130 S.Ct. 3138, even though the Commission quite obviously both enforces and adjudicates. As explained . by the Court in Morrison, the cramped view of the separation of powers favored by the dissenters must be rejected: The dissent says that the language of Article II vesting the executive power of the United States in the President requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President and be removable by him at will. ... This rigid demarcation—a demarcation incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known-, nor foreseen by the Framers—depends upon an extrapolation from general constitutional language which we think is more than the text .will bear. It is also contrary to our holding in United States v. Perkins, [ 116 U.S. 483, 6 S.Ct. 449, 29 L.Ed, 700,] decided more than a century ago. Morrison, 487 U.S. at 690, n.29, 108 S.Ct. 2597 (emphasis added). In sum-, the dissenters have warped the current meaning of Myers. There is no rule requiring direct presidential supervision of all officers, with the only potential exception for' “purely” judicial officers or officers having no “substantial” executive power; rather, Humphrey’s Executor “narrowly confined the scope of the Myers decision to include only ‘all purely executive officers.’ ” Wiener, 357 U.S. at 352, 78 S.Ct. 1275 (quoting Humphrey's Executor, 295 U.S. at 628, 55 S.Ct. 869).[2] In their other major line of attack, the dissenters seek to overcome the precedent upholding tenure protection for officers with significant quasi-judicial and quasi-legislative responsibilities by distinguishing the CFPB, headed by a single director, from independent agencies headed by mul-timember commissions. In this regard, a few other points bear mention. As noted in the Majority Opinion, Congress mostly reshuffled existing responsibilities from other entities to the CFPB. Maj. Op. 80-81.1 do not read the dissenting opinions as suggesting that the Constitution prohibits Congress from reassigning responsibilities from existing independent agencies to a new independent agency. Instead, the dissenters contend that ‘the Constitution Requires the new independent agency to be headed by multiple members in order to receive tenure protection; Congress cannot depart from that model. However, just as “[o]ur constitutional principles of separated powers are not violated ... by mere anomaly or innovation,” Mistretta v. United States, 488 U.S. 361, 385, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), I do not believe that the concept of “two heads are better than one” has been elevated to a constitutional requirement of agency leadership. Single individuals have been entrusted with important decision-making authority throughout our government from the Founding, see Maj. Op. 96-97, so I am not swayed by the dissenters’ suggestion that the possibility of poor decisionmaking creates a constitutional defect. For our separation-of-powers analysis, there are two critical questions: How much, if at all, does the single-director structure decrease the agency’s accountability to the President in comparison to a multi-member agency? And is the President’s control so diminished as-to “interfere impermissibly with his constitutional obligation to ensure faithful execution of the laws”? Morrison, 487 U.S. at 693, 108 S.Ct. 2597. As the Majority Opinion points out, the assumption that the single-director structure gives the President less control over the agency is dubious at best. Maj. Op. 43-45. Furthermore, we have a “duty ... to construe [the CFPB] statute in order to save it from constitutional infirmities” and to avoid “overstating] the matter” when describing the power and independence of the Director. Morrison, 487 U.S. at 682, 108 S.Ct. 2597. I fear the dissenters have overstated the power of the Director and understated the checks on that power. I grant that having a single person in charge of the CFPB is different than having a multi-member body, but we cannot downplay the fact that Congress also required extensive coordination, expert consultation, and oversight of the Director. If much was given to the Director, then much was also required: 1.The CFPB is required to “coordinate” with the SEC, FTC, Commodity Futures Trading Commission (“CFTC”), and other federal and . state regulators “to promote consistent regulatory treatment of consumer financial and investment products and services.” 12 U.S.C. § 5495. There are numerous other “coordination” requirements. See, e.g., id. § 5515(b)(2) (requiring coordination with’ prudential regulators and state bank regulatory authorities), § 5516(d)(2) (requiring coordination with prudential regulators for ■ enforcement actions against banks). 2. The Director must establish a Consumer Advisory Board, full of experts, to “advise and consult with the Bureau” at least twice a year. 12 U.S.C. § 5494(a), (c).' 3. -The CFPB is required to “consult” with other federal agencies prior to proposing new rules to ensure “com sistency with prudential, market, or systemic objectives administered by such agencies.” 12 U.S.C. § 5512(b)(2)(B). 4. The CFPB is not’only required to continue the consultation during the comment process regarding the category of proposed rules described above, but if any agency objects to the proposed rule, the CFPB must also “include in the adopting release á description of the objection and the basis for the Bureau - decision, if any, regarding such objection.” 12 U.S.C. § 5512(b)(2)(C). 5. The CFPB must also consult with other federal agencies prior to promulgating a rule, prohibiting unfair, abusive, or deceptive practices, again to ensure “consistency.” 12 U.S.C. § 5531(e), 6. The CFPB is required to “conduct an assessment of each significant rule or order” addressing “the effec- • -tiveness of the rule or order in meeting the purposes and objectives” of the statute and the goals of the agency, using the “available evidence-and any data that the [CFPB] reasonably may collect.” 12 U.S.C. § 5512(d)(1). ‘ 7. Along with creating the CFPB, Congress created the Financial Stability Oversight Council (“FSOC”), 12 U.S.C. § 5321, and gave it authority to stay or veto any final CFPB rule by a two-thirds vote of its members if the Council finds that the regulation “would put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk.” Id. § 5513. In sum, Congress guided (and limited) the discretion of the Director of the CFPB in a very robust manner. Of course, the CFPB is not the only independent agency with consultation requirements, and the Dodd-Frank Act imposed new consultation requirements upon a number of agencies. See Jody Freeman & Jim Rossi, Agency Coordination in Shared Regulatory Space, 125 HARV. L. REV. 1131, 1168 (2012); Susan Block-Lieb, Accountability and the Bureau of Consumer Financial Protection, 7 Brook. J. Corp. Fin. & Com. L. 25, 55-56 (2012). But “[t]he Dodd-Frank Act does not subject any of the other federal financial regulators to similar overarching coordination requirements .... ” U.S. Gov’t Accountability Office, GAO-12-151, Dodd Frank Act Regulations: Implementation Could Benefit From Additional Anal-yses and Coordination 22 (2011). With the amount of “coordination” and “consultation” required of the CFPB by statute, there can be no doubt that the Director operates with as much expert advice as any other independent agency. Congress went even further, repeatedly requiring the Director to seek “consistency” with other agencies, and in some circumstances, requiring the Director to explain why he or she failed to heed an objection of another agency. Congress even required the Director to give a yearly after-action report assessing the merits of every significant rule or order. But here’s the kicker: Congress created a new entity, the above-described Financial Stability Oversight Council, with veto power over any rule promulgated by the Director that the Council believes will “put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk.” 12 U.S.C. § 5513. Any member of the Council can file a petition to stay or revoke a rule, which can be granted with a two-thirds majority vote. See id. Thus, if the Director’s decisionmaking goes awry on a critical rulemaking, a multi-member body of experts can step in. Significantly, a supermajority of persons on the Council are designated by the President.[3] The veto is powerful enough, but the filing of a petition alone will trigger congressional oversight, since it “shall be published in the Federal Register and transmitted contemporaneously with filing to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives.” 12 U.S.C. § 5513(b)(2). The choice Congress made to impose additional statutory requirements on CFPB action makes the CFPB Director more accountable to the President, not less.[4] These myriad coordination and consultation requirements have further significance for the separation-of-powers analysis: They give the President more potential ammunition to remove the CFPB Director than for the average officer. For-cause removal protections are meaningful as a bulwark against undue political influence in agencies relied on for their expertise and independent judgment. But the standard of removal for “inefficiency, neglect of duty, or malfeasance in office” does not afford officers who head independent agencies with unlimited discretion or untrammeled power. Here, the Director’s failure to abide by the stringent statutory requirements of consultation or coordination would almost certainly constitute “neglect of duty.” And the promulgation of a rule contrary to consensus expert advice without sufficient grounds or explanation would subject the Director to risk of removal for inefficiency. Although the Supreme Court has largely avoided the task of spelling out precisely what conduct constitutes “cause” to remove officers under Humphrey’s Executor, “inefficiency, neglect of duty, or malfeasance in office” provides a workable standard, and lower courts have long adjudicated the meaning of those terms in similar contexts. Congress first used “inefficiency, neglect of duty, or malfeasance in office” as a removal standard for officers of the Interstate Commerce Commission and the General Board of Appraisers in 1887 and 1890, respectively. See An Act to Regulate Commerce, ch. 104, § 11,24 Stat. 379, 383 (1887); An Act to Simplify the Laws in Relation to the Collection of the Revenues, ch. 407, § 12, 26 Stat. 131, 136 (1890).[5] The use of “efficiency” as a standard for removal of federal employees arose historically in the context of civil-service statutes around the same time period—the late-nineteenth and early-twentieth centuries. See Myers, 272 U.S. at 74-75 & nn. 30-32 (Brandéis, J., dissenting) (collecting statutes). The Lloyd-LaFollette Act of 1912, 5 U.S.C. § 7513—like its predecessor, the Pendleton Act of 1883—sought to establish a civil service based on merit and unshackled from patronage. The Lloyd-LaFollette Act included language providing that employees in competitive service could be removed “only for such cause as will promote the efficiency of the service.” Id. § 7513(a). As interpreted by courts and agencies for nearly a century, “inefficiency” provides a broad standard allowing for the removal of employees whose performance is found lacking. What constitutes “inefficiency” has varied depending on the context of the officer or employee’s responsibilities and functions, but it -is best described as incompetence or deficient performáncé. See, e.g., Burnap v. United States, 53 Ct. Cl. 605, 609 (Ct. Cl. 1918) (upholding the removal of a landscape architect for inefficiency due to his failure to heed his( supervisor’s instructions to cease working for private clients), aff'd, 252 U.S. 512, 519-20 (1920) (rejecting procedural and constitutional .challenges, and upholding the removal); Thomas v. Ward, 225 F.2d 953, 954 (D.C. Cir. 1955) (upholding a Navy personnel officer’s removal for inefficiency when the officer was -charged with “Mck of professional knowledge and supervisory ability; poor personnel management and public relations and acts of misconduct involving failure to carry out orders; disloyalty to his superiors and untruthfulness in official relations with other employees”); Seebach v. Cullen, 338 F.2d 663, 665 (9th Cir. 1964) (upholding the dismissal of an IRS Auditor for “[inefficiency in handling tax cases as evidenced by technical and procedural errors, substandard report writing, and lack of proper audit techniques”); King v. Hampton, 412 F. Supp. 827 (E.D. Va. 1976) (upholding the removal of a Navy electronics engineer for inefficiency); Alpert v. United States, 161 Ct. Cl. 810 (Ct. Cl. 1963) (inefficiency removal sustained when an employee of a VA Hospital was charged with “Insubordination, Tardiness, Improper Conduct, and Unsatisfactory Interpersonal Relationships”); DeBusk v. United States, 132 Ct. Cl. 790 (Ct. Cl. 1955) (upholding removal of VA loan examiner for failure to “promote the efficiency of the service” based on charges of his disrespect of supervisors and failure to follow instructions); Fleming v. U.S. Postal Serv., 30 M.S.P.R. 302, 308 (M.S.P.B. 1986) (upholding removal for “inefficiency” based on numerous unscheduled absences from work); see also Arnett v. Kennedy, 416 U.S. 134, 158-64 (1974) (upholding “efficiency?’ standard against vagueness challenge); see generally, 1 Peter Broida, A Guide to Merit Systems Protection Board Law & Practice 1669,1713 (Dewey Publ’ns Inc; 2012) (discussing cases upholding re-' moval of federal employees for inefficiency); 1 Isidore Silver, Public Employee Discharge & Discipline § 3.23 (John Wiley <& Sons Inc. 2d ed. 1995) (discussing the role of MSPB in adjudicating disputes over removals for inefficiency); Office of Personnel Management, Federal Personnel Manual 752-15 (1989) (on file in the D.C. Circuit Library) (collecting cases upholding removal of federal employees for inefficiency); Robert Vaughn, Principles of Civil Service Law §§ 1, 5 (Matthew Bender & Co. 1976) (discussing the origins of civil service law and the “efficiency” standard). In sum, this body of authority from the past century demonstrates that the CFPB Director would be subject to supervision and discipline for “inefficiency” if he or she failed to comply with the various statutory mandates of coordination and consultation. It also shows that “inefficiency” is relatively broad and provides a judicially manageable standard. I agree with the overall sentiment of Judge Griffith that the broad removal authority gives the President adequate ability to supervise the CFPB Director,[6] Griffith Concurring Op. 137, but I do not agree that “inefficiency[5]’ is properly construed to allow removal for mere policy disagreements. Such a'capacious construction would essentially remove the concept of “independence” from “independent agencies.” After all, Congress established the CFPB as “an independent bureau,” 12 U.S.C. § 5491(a), and an agency subject to the President’s blanket control oyer its policy choices is hardly “independent.” See, e.g., New Oxford American Dictionary 857 (2d. ed. 2005) (“free from outside control; not depending on another’s authority”); Black’s Law Dictionary 838 (9th ed. 2009) (“Not subject to the control or influence of another”); Webster’s Third New International Dictionary 1148 (1993) (“not subject to control by others: not subordinate”); The American Heritage Dictionary 654 (2d College ed. 1985) (“1. Politically autonomous; self-governing. 2. Free from the influence, guidance, or control of another ....”); see also 5 The Century Dictionary And Cyclopedia 3055 (1911) (“Not dependent; not requiring the support or not subject to the control or controlling influence of others; not relying on others for direction or guidance”); Henry Campbell Black, A Law Dictionary 616 (2d ed. 1910) (“Not dependent; not subject to control, restriction, modification, or limitation from a given outside source”); Noah Webster, A Compendious Dictionary of the English Language 156 (1806) (“not subject to control, free .... ”). Black’s Law Dictionary has traced the term “independent agency” back to 1902 and defines it as “a federal agency, commission, or board that is not under the direction of the executive .... ” Black’s Law Dictionary 71-72 (9th ed. 2009) (emphasis added). Thus, even if the meaning of “inefficiency” could be construed, in isolation, as broadly as Judge Griffith contends, “[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.” U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). The removal standard must be interpreted in light of the fact that' Congress designated the CFPB as “an independent bureau,” 12 U.S.C. § 5491(a), and even if agency independence exists on a spectrum, Griffith Concurring Op. 23-24, the spectrum has a limit. The essence of an independent agency is that it “be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of [the President],” Humphrey’s Executor, 295 U.S. at 625, 55 S.Ct. 869. Judge Griffith’s broad reading of the removal power is inconsistent with the common understanding of “independent” and “would render part of the statute entirely superfluous, something we are loath to do.” Cooper Indus., Inc. v. Aviall Servs., Inc., 543 U.S. 157, 166, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004). See also Maj. Op. 90-93 (discussing the historical independence of financial regulators). This is why the interpretation of “inefficiency” for lower-level federal workers is instructive, but not dispositive, because no one imagines that federal employees are entitled to be “independent” of their bosses in the way Congress clearly intended the Director of the CFPB to remain- “independent” from the President. Although the dissenters take great pains to distinguish the single-director structure of the CFPB from the multi-member structure of other agencies, they fail to show that this structural difference so impairs presidential control that it poses a constitutional problem. Or even that it provides the President less control over the CFPB than over other independent agencies. The upshot of the dissenters’ cramped reading of the Supreme Court’s separation-of-powers jurisprudence is that the President cannot exercise meaningful control over the Executive branch without the ability to remove all principal officers for any reason (or no reason at all). That is not the import of the Supreme Court’s separation-of-powers cases from Myers to Free Enterprise Fund. Those cases establish constitutional boundaries which the CFPB falls well within. * * * * While the Constitution requires that the President be permitted to hold principal and inferior officers to account, it also accommodates—and may, at times, even require—a degree of independence for those officers who perform quasi-judicial and quasi-legislative functions. So here. And just as the commissioners on a multi-member board must consult with each other before acting, the CFPB Director is required to consult with a plethora of colleagues and experts. Furthermore, the unique combination of oversight provisions in the Dodd-Frank Act gives the President greatly enhanced control over the CFPB compared to other independent agencies. A proper balancing of these considerations against the factors that arguably diminish the President’s control requires that we uphold the present “good cause” tenure protections applicable to the CFPB Director. In sum, “[I] do not think that this limitation as it presently stands sufficiently deprives the President of control over the [CFPB Director] to interfere im-permissibly with his constitutional obligation to ensure the faithful execution of the laws,” Morrison, 487 U.S. at 693, 108 S.Ct. -2597.1 therefore concur in the denial of the constitutional claim in the petition. . The substantive differences between the removal restrictions of Board members and ALJs provided another important distinction in Free Enterprise Fund. The tenure protection struck down in Free Enterprise Fund was "unusually high.” 561 U.S. at 503, 130 S.Ct. 3138. The only violations of law that could lead to removal were violations of "provision[s] of [the Sarbanes-Oxley] Act, the rules of the [PCAOB], or the securities laws,” 15 U.S.C. § 7217(d)(3)(A), and Board members could only be removed if those violations or abuses were committed “willfully,” id. § 7217(d)(3)(A)-(B). The Court noted that a Board member could not be removed even if, for' example, he cheated on his taxes', even though such an action could greatly diminish the confidence that the member would faithfully carry out his or her duties. Free Enterprise Fund, 561 U.S. at 503, 130 S.Ct. 3138, By contrast, the removal standard for ALJs is quite modest. ALJs can be removed for "good cause,” 5 U.S.C. § 7521, which has been interpreted to require that an ALJ "act at all times in a manner that promotes public confidence in [] independence, integrity, and impartiality ... and ... avoid[s] impropriety and the appearance of impropriety,” a standard borrowed from the American Bar Association’s Model Code of Judicial Conduct. Long v. Soc. Sec. Admin., 635 F.3d 526, 533 (Fed. Cir. 2011). Accordingly, ALJs have been disciplined or removed for a wide variety of job-related misconduct, such as improperly using the imprimatur of the agency for personal business, Steverson v. Soc. Sec. Admin., 383 Fed.Appx. 939 (Fed. Cir. 2010); lack of productivity in comparison to colleagues, Shapiro v. Soc. Sec. Admin., 800 F.3d 1332, 1334-36 (Fed. Cir. 2015); failure to follow mandatory office procedures, Brennan v. Dep’t of Health & Human Servs., 787 F.2d 1559, 1561 (Fed. Cir. 1986), as well as for misbehavior not directly connected to official duties, such as domestic violence, Long, 635 F.3d 526. And in contrast to the Court’s concern in Free Enterprise Fund about the inability to remove a tax-cheating Board member, an ALJ has been fired for "financial irresponsibility” in failing to repay debts. See McEachern v. Macy, 341 F.2d 895 (4th Cir. 1965). . The 'dissenters seek to cast aspersions on Humphrey’s Executor, painting, it as an outlier in the Court’s separation-of-powers jurisprudence. See Kavanaugh Dissenting Op. 194 n,18; Henderson Dissenting Op, 155-56. Perhaps all that need be said in response is that the case binds us, as an inferior court. U.S. Const.' Art. Ill, §•!, Nonetheless, it is worth noting that Humphrey’s Executor was a unanimous opinion and that all-four Justices from .the Myers .majority who remained on the Court nine years later joined the opinion; indeed, one- of those members of the Myers majority, Justice Sutherland, wrote the opinion. It thus seems inconceivable that the Court in Humphrey’s Executor did not understand what part of Myers was its holding rather than dictum. . The Secretary of the Treasury, who serves at the pleasure of the President, chairs the Council. 12 U.S.C. § 5321(b)(1)(A). In addition, the chairpersons of five independent agencies serve on the Council, each of whom the President has the opportunity to appoint either at the outset or near the beginning of the administration. See 15 U.S.C. § 78d (SEC Chair); 12 U.S.C. § 1812(b)(1) (Chair of the Federal Deposit Insurance Corporation); 7 U.S.C. § 2(a)(2)(B) (Chair of the Commodity Futures Trading Commission); 12 U.S.C. § 1752a(b)(l) (Chair of the National Credit Union Association); 12 U.S.C. §§ 241, 242, 244 (Chair of the Federal Reserve Board of Governors, whose four-year term expires just after the first year of a new presidential administration taking office in a presidential election year). Only four members of the FSOC have terms longer than four years and are thus potentially not appointed by a one-term President: the CFPB Director (five-year term), 12 U.S.C. § 5491(c)(1); the Director of the Federal Housing Finance Association (five-year term), 12 U.S.C. § 4512(b)(2); the Comptroller of the Currency (five-year term), 12 U.S.C. § 2; and the "independent member” of the FSOC (six-year term), 12 U.S.C. §§ 5321(b)(l)(J), (c)(1). . Judge Kavanaugh makes much of the fact that the CFPB Director’s five-year term could result in a one-term President being unable to remake the agency by naming a CFPB Director during his or her tenure. Kavanaugh Dissenting Op. 190-91. However, the same can be said of the Federal Reserve, where, absent the circumstance of a Board Member’s early retirement, a President can never appoint a majority of the Board. See 12 U.S.C. §§ 241, 242 (establishing a seven-member Board with staggered, fourteen-year terms, removable only for cause). . Because Congress did not specify a term of years for appraisers, the Supreme Court concluded that inefficiency, neglect of duty and malfeasance were not exclusive, grounds for removal, because otherwise, the office of appraiser would be a lifetime appointment. Shurtleff v. United States, 189 U.S. 311, 316, 23 S.Ct. 535, 47 L.Ed. 828 (1903). The Court "recognized and applied the strong presumption against the creation of a life tenure in a public office under the federal government.” De Castro v. Bd. of Comm’rs of San Juan, 322 U.S. 451, 462, 64 S.Ct. 1121, 88 L.Ed. 1384 (1944) (explaining Shurtleff)-, see also Humphrey’s Executor, 295 U.S. at 622-23, 55 S.Ct. 869 (finding the removal grounds exclusive for FTC Commissioners, because the statute provided for a fixed term of office, distinguishing Shurtleff). . Of course, the above presumes that the President is forced to take formal action against a poorly performing Director. Defending against a personnel action brought by the President has grave personal and professional consequences. Thus, a Director under pressure may decide to step down to "spend more time with the family,” preferring a soft landing to an ignominious expulsion. . See also Abner S. Greene, Checks and Balances in an Era of Presidential Lawmaking, 61 U, Chi. L. Rev. 123, 171 n.187 (1994) ("It is fairly clear that the Humphrey’s Executor Court construed the removal language to prevent removal for policy disagreement.”).